933 P.2d 1197

**STATE of Arizona, Appellee,**

v.

**Timothy Roosevelt BOLES, Appellant.**

Supreme Court of Arizona,
En Banc.

March 13, 1997.

Grant Woods, Arizona Attorney General by Paul J. McMurdie, Galen H. Wilkes, Randall M. Howe, Phoenix, for State of Arizona.

Dean W. Trebesch, Maricopa County Public Defender by James H. Kemper, Phoenix, for Appellant.

## OPINION

FELDMAN, Justice.

Timothy Roosevelt Boles (Defendant) appealed his convictions for eighteen felonies arising out of various sexual offenses. On review, a majority of the court of appeals found that although the trial judge properly admitted evidence that Defendant's DNA autoradiogram matched that of the samples recovered from two of the victims, he committed fundamental error by allowing the state's experts to express opinions that implied the autorad match positively identified Defendant. Because the majority found error that tainted all the jury's verdicts, the court of appeals reversed Defendant's convictions and remanded for retrial. *State v. Boles,* 183 Ariz. 563, 905 P.2d 572 (1995).

We granted the state's petition for review pursuant to Rule 31.19, Arizona Rules of Criminal Procedure. We have jurisdiction under the Arizona Constitution, art. VI, § 5(3).

## FACTS AND PROCEDURAL HISTORY

The charges against Defendant arose out of a series of similar sexual assaults committed over three years at apartment complexes in the vicinity of 15th Avenue and Glendale in Phoenix. After the first attack on a thirteen-year-old girl who was kidnaped from her apartment and raped, Defendant was stopped by police as he ran in the alley behind the apartments. The victim's description of her attacker matched Defendant. He was released, however, because initial reports said the attacker was white. Eighteen months later, a twelve-year-old girl was kidnaped as she. walked from the laundry room to her apartment. Within two months a twenty-year old woman was also raped. Another two months passed and a ten year-old girl was taken from her apartment and sexually assaulted. During the period between the last three rapes, a black male matching Defendant's description was observed peering into apartment windows by a paper boy and a police surveillance team in the vicinity of the rapes. He was arrested for trespassing at the same apartment complex where the first victim had lived. After his arrest, Defendant exhibited unusual knowledge of the crimes. A search of his residence uncovered several pieces of clothing like that described by the victims.

Sperm samples were obtained from the second and third victims' clothing and were analyzed by the Department of Public Safety (DPS) laboratory. DPS ran five probes in each case. The DNA sample from Defendant matched at four probes but was inconclusive at the fifth because of difficulty sizing the lower bands. These problems, however, did not exclude a match.

Before trial, a *Frye* hearing was held on the admissibility of statistical evidence of the probability of a random match. The trial judge found the methods used were inadmissible because they were not generally accepted in the scientific community. However, the judge permitted opinion testimony based on the DNA experts' interpretation of the DNA test results. The DPS analyst and a University of Arizona professor reviewed the autoradiograms and concluded that the semen found on the two victims' clothing

matched Defendant's DNA. Both experts testified that they had never seen or heard of two unrelated people having DNA that matched over four or five probes, although it was theoretically possible. Likewise, Defendant's expert, Dr. Action, testified that except for a small Indian tribe in South America, where there was evidence of inbreeding, he had not heard of DNA from two individuals matching at four or five probes. He also conceded that while there is not enough DNA data to establish that two individuals' DNA could not match at four or five probes, in 5,000 paternity cases he had not seen a four-probe match between two unrelated individuals.

Other physical evidence, including hair comparisons, serological evidence, and shoe prints, linked Defendant with the other two victims. Defendant was found guilty of eighteen felony counts, including four counts of burglary, four counts of kidnaping, one count of aggravated assault, three counts of sexual abuse, two counts of sexual conduct with a minor, two counts of molestation of a child, and two counts of sexual assault.

## DISCUSSION

Following its opinion in State v. Hummert, 183 Ariz. 484, 905 P.2d 493 (1995),[1] the court of appeals found that the expert testimony should not have been admitted because it necessarily assumed the validity of the inadmissible probability statistics. Boles, 183 Ariz. at 571, 905 P.2d at 580. The court stated that in the absence of a generally accepted method of determining random match probability estimates, experts can only testify that the DNA match fails to exclude the defendant. Dissenting, however, Judge Ehrlich believed that the majority erred in concluding that the state's experts implicitly relied on probability statistics. In her view, limiting experts to testifying that a match merely fails to exclude the defendant unrea-

sonably divests the DNA evidence of its compelling nature. Id. at 577, 905 P.2d at 586.

The issues at hand have been fully discussed in State v. Bible, 175 Ariz. 549, 858 P.2d 1152 (1993), cert. denied, 511 U.S. 1046, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994); State v. Johnson, 186 Ariz. 329, 922 P.2d 294 (1996); and Hummert. In Bible we allowed the admission of evidence of a match of two DNA samples, stating that when DNA samples profiled using the RFLP method match, "the conclusion is that they may be from the same individual." 175 Ariz. at 590, 858 P.2d at 1193. Although we rejected Cellmark laboratory's method for determining population frequency statistics as flawed and thus not generally accepted by the relevant scientific community, we "expressly [did] not decide whether the inadmissibility of the random match probability calculations means that other DNA evidence such as evidence of a match is inadmissible. . . ." Id.

In Johnson we held that the modified ceiling method, developed by the National Research Council (NRC)[2] to make DNA analysis useful for forensic use, ensures that the random match probabilities calculated are very conservative and thus protect a defendant's rights. 186 Ariz. at 333, 922 P.2d at 298. This method had been generally accepted by the relevant scientific community; thus, DNA probability calculations computed using the modified ceiling method are admissible under Frye. Id. at 334, 922 P.2d at 300. Subsequently, in its 1996 final revision,[3] the NRC concluded the modified ceiling method is too conservative and suggested the use of random match probability statistics calculated by using the product rule, with certain modifications made to compensate for subpopulations, isolated populations, and related individuals. NATIONAL RESEARCH COUNCIL, THE EVALUATION OF FORENSIC DNA EVIDENCE 5–32 (1996) (pre-publication copy) (1996 Report).

---

1. We recently vacated the court of appeals' opinion in Hummert. See State v. Hummert, 188 Ariz. 119, 933 P.2d 1187 (1997).

2. See NATIONAL RESEARCH COUNCIL, THE EVALUATION OF FORENSIC DNA EVIDENCE (1992).

3. Neither this revision nor our opinions in Johnson and Hummert were available to the court of appeals at the time it decided the present case.

The court of appeals was concerned that without statistical or numerical interpretation of the probability of a random match, the evidence of a match was too prejudicial and thus inadmissible. But in this case, as in *Hummert*, the experts instead testified to both their personal experience with random matches and the significance of a match at several loci. The court of appeals held that this type of evidence was also inadmissible. However, our understanding of the pertinent scientific literature, particularly the NRC's 1996 revision, makes no specific requirements for the form of testimony expressing the significance of a match. The Report states:

> Scientifically valid testimony about matching DNA can take many forms. The conceivable alternatives include statements of the posterior probability that the defendant is the source of the evidence DNA, qualitative characterizations of this probability, computations of the likelihood ratio for the hypothesis that the defendant is the source, qualitative statements of this measure of the strength of the evidence, the currently dominant estimates of profile frequencies or random-match probabilities, and unadorned reports of a match. Courts or legislatures must decide which of these alternatives best meet the needs of the criminal justice system.

1996 Report, at ES–7 (emphasis deleted).

Thus, we held in *Hummert* that not only are various methods allowable for expressing the significance of a match of two DNA profiles, but that Arizona Rules of Evidence 702 and 703 permit opinion evidence by an expert on the rarity of the profiles of two unrelated persons matching when experts testify concerning their own experimentation and observation. *State v. Hummert*, 188 Ariz. 119, 933 P.2d 1187 (1997). This is because the weight of the experts' opinions about their personal experience with random matches did not rely on accuracy of an applied principle of science but on each expert's personal credibility, experience, and interpretations. *Hummert*, 124, 933 P.2d at 1192; see also *State v. Roscoe*, 145 Ariz. 212, 220, 700 P.2d 1312, 1320 (1984).

## CONCLUSION

 Because evidence of a match, even without statistical interpretations of its significance, is admissible, and expert opinion based on personal experience on the likelihood of a random match is admissible, the trial judge did not err in allowing the two experts to testify about either the match or their experience with the possibility of a random match. Therefore, we vacate the court of appeals' opinion and affirm the trial judge's rulings and Defendant's convictions.

THOMAS A. ZLAKET, C.J., and MOELLER and MARTONE, JJ., and EINO M. JACOBSON, Judge (Retired), concur.

ROBERT J. CORCORCAN, J. did not participate in the determination of this matter; pursuant to Ariz. Const. art. VI, § 3, the Honorable EINO M. JACOBSON, Judge (Retired) of the Arizona Court of Appeals, Division One, was designated to sit in his stead.